**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: Application of Credit Suisse Virtuoso SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Finance Fund | No. MC-21-00051-PHX-DWL<br><br>**ORDER** |

  Credit Suisse Virtuoso SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Finance Fund ("Petitioner") filed an *ex parte* application pursuant to 28 U.S.C. § 1782 for leave to serve a subpoena on Katerra Inc. ("Katerra Cayman"). (Doc. 1.) For the following reasons, the application is granted.

## BACKGROUND

  Petitioner seeks to serve the subpoena (Doc. 1-2) on Katerra Cayman to collect documents related to a series of transactions involving Katerra Cayman and its affiliates (collectively, "Katerra"), Petitioner, and others. (Doc. 1 at 1-2.) The subpoena is for "use in a planned court proceeding in England" and would be potentially used against at least the following entities: (1) SoftBank Group Corp.; (2) SoftBank Vision Fund LP; (3) SoftBank Vision Fund II-2 LP; (4) SVF Abode (Cayman) Limited; (5) SVF II Abode (Cayman) Limited; and (6) SVF Habitat (Cayman) Limited (collectively, the "Potential SoftBank Defendants").

  Credit Suisse (Lux) Supply Chain Finance Fund is sub-fund of Credit Suisse Virtuoso SICAV-SIF that "was designed to invest primarily in notes connected to so-called supply chain finance programs, including programs organized by a group of companies

collectively known as Greensill." (*Id.* at 4.) Around the beginning of 2019, the sub-fund purchased notes backed by the accounts receivable of Katerra. (*Id.*) "With regard to Katerra specifically, a Greensill company called [Greensill Ltd.] would purchase Katerra's accounts receivable pursuant to terms set forth in a Receivables Purchase Agreement between Katerra and Greensill Ltd. dated December 9, 2019 (the 'Katerra RPA')." (*Id.*) "By early 2020, Petitioner had purchased a total of approximately $440 million worth of [n]otes backed by rights to those Katerra receivables." (*Id.* at 5.)

Katerra began experiencing financial difficulties toward the end of 2020. (*Id.*) As a result of Katerra's financial instability, Katerra, the Potential Softbank Defendants, and other entities (not including Petitioner) "engaged in the Katerra Restructuring," which included Greensill Ltd. giving up "its right to Katerra's accounts receivable and [agreeing] that the Katerra RPA would be cancelled." (*Id.* at 5-6.) Later, and "most central" to the current dispute, "Greensill Ltd. and Katerra entered into a letter agreement (the 'Security Release Agreement') wherein Greensill Ltd. purported to release various liens on assets Katerra had put up as collateral in connection with the Katerra RPA." (*Id.* at 6.) Then, "on December 30, 2020, Greensill Ltd. and Katerra entered into a 'Contribution and Exchange Agreement' (the 'CEA') by which Greensill Ltd. purported to cancel any amounts then owed under the Katerra RPA, assigned back to Katerra all rights to any receivables Katerra had previously sold to Greensill Ltd., and render[ed] the Katerra RPA null and void going forward." (*Id.*)

Petitioner asserts that it was unaware these transactions were occurring and that the Potential Softbank Defendants "orchestrated a deal wherein Greensill purported to give up its rights to the $440 million outstanding under the Katerra RPA (and associated security and guarantees) even though it was *Petitioner* who ultimately stood to lose by virtue of that deal." (*Id.* at 7.) As a result of the Katerra Restructuring, Katerra Cayman's equity was held by some of the Potential Softbank Defendants, Greensill became insolvent, and "Petitioner has not been paid any portion of the $440 million it invested into those [n]otes." (*Id.*)

With this backdrop in mind, the application states that "Petitioner plans to assert a claim against the [Potential] Softbank Defendants pursuant Section 423 of the Insolvency Act 1986," which "allows English courts to order remedial measures to make whole victims of undervalued transactions that put valuable assets—such as amounts outstanding under the Katerra receivables program—beyond the reach of a person or entity, like Petitioner, who might make a claim against an insolvent entity for those assets." (*Id.* at 3.) Specifically, Petitioner intends to "allege that the Security Release Agreement, the CEA, and the Share Disposal Agreement . . . constituted undervalue transactions within the scope of Section 423, and that the [Potential Softbank] Defendants who benefited from those transactions ought to make payments or take other action to restore the parties' positions to what they would have been if the transactions had not been entered into and to protect the interests of the Petitioner as a victim of those transactions." (*Id.* at 9.)

Although the English Lawsuit had not commenced at the time Petitioner filed the application (and the Court is unaware whether it has since commenced), Petitioner explains that the "preparation of the English Lawsuit is well advanced" because it "has retained U.K. counsel and Petitioner's U.K. counsel has already: (i) exchanged detailed correspondence with counsel for the Softbank Defendants concerning Petitioner's claim under Section 423 and other claims Petitioner may assert and (ii) retained English barristers to advise Petitioner and finalize the claim initiating the English Lawsuit." (*Id.* at 9 [citing Doc. 1-3 ¶¶ 61-70, 75].)

**DISCUSSION**

Petitioner seeks relief on an *ex parte* basis. "[A]n ex parte application is an acceptable method for seeking discovery pursuant to 28 U.S.C. § 1782." *In re Application of Ontario Principals' Council*, 2014 WL 3845082, *2 (D. Ariz. 2014). *See also Republic of Kazakhstan v. Lawler*, 2019 WL 5558997, *2 (D. Ariz. 2019) (same). "[S]uch ex parte applications are typically justified by the fact that the parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it." *In re Letter of Request from Supreme Court*

*of Hong Kong*, 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991). *See also In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976) ("Letters Rogatory are customarily received and appropriate action taken with respect thereto *ex parte*. The witnesses can and have raised objections and exercised their due process rights by motions to quash the subpoenas.").

On the merits, the decision whether to grant a § 1782 application involves a two-step inquiry. First, the application must meet the statutory requirements of § 1782. *See, e.g.*, *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83-84 (2d Cir. 2004). Second, even if the statutory requirements are satisfied, several discretionary factors bear on whether relief ought to be granted. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004). "[A] district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Id.*

I.  Statutory Requirements

A district court has the authority to issue a discovery order under § 1782 when three criteria are satisfied. The application must show that (1) the person from whom discovery is sought "resides or is found" in the same district as the district court; (2) the discovery material is for "use in a foreign or international tribunal"; and (3) the application is brought by "a foreign or international tribunal or . . . any interested person." 28 U.S.C. § 1782(a).

Here, all three criteria are satisfied. First, Petitioner has submitted evidence establishing that Katerra Cayman "resides or is found" in Arizona because, although it is incorporated in the Cayman Islands, its principal place of business is in Scottsdale, Arizona. (Doc. 1 at 10; Doc. 1-3 ¶ 44.)

Second, although Petitioner had not initiated the English lawsuit at the time it filed the pending application, "a foreign proceeding need not be 'pending' or even 'imminent' when the discovery is sought. So long as a future proceeding is 'within reasonable contemplation,' it satisfies the statute's requirement." *Khrapunov v. Prosyankin*, 931 F.3d 922, 925 (9th Cir. 2019) (citation omitted). The applicant "must show that the proceeding is not speculative, and is 'more than just a twinkle in counsel's eye.'" *Leutheusser-*

*Schnarrenberger v. Kogan*, 2018 WL 5095133, *3 (N.D. Cal. 2018) (citation omitted). Here, Petitioner has retained counsel, sent a 31-page demand letter to the Potential SoftBank Defendants, exchanged follow-up correspondence with counsel for SoftBank Group Corp., and developed in extensive detail the legal theories it intends to pursue during the contemplated litigation. (Doc. 1 at 7-9; Doc. 1-3 ¶¶ 61-75.) These steps demonstrate that the English Lawsuit is within reasonable contemplation and is more than just a twinkle in counsel's eye.

Third, Petitioner "qualifies as an 'interested person' because it will be a party to the anticipated litigation." *In re Eurasian Nat. Res. Corp., Ltd.*, 2018 WL 1557167, *2 (N.D. Cal. 2018).

II. <u>Discretionary Factors</u>

In *Intel*, the Supreme Court identified the following four "factors that bear consideration in ruling on a § 1782(a) request":

(1) Whether "the person from whom discovery is sought is a participant in the foreign proceeding," because "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid";

(2) "[T]he nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";

(3) Whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

(4) Whether the request is "unduly intrusive or burdensome."

542 U.S. at 264-65. Here, all four factors weigh in favor of granting the application.

First, Petitioner has submitted evidence that "Katerra Cayman will not be a defendant in the English Lawsuit." (Doc. 1-3 ¶ 90.) As such, Katerra Cayman is a nonparticipant in the matter for which discovery is sought.

Second, the Court is not aware of any authority suggesting that an English court

would be unwilling to accept discovery under § 1782. *See, e.g., In re Application of JSC Com. Bank Privatbank*, 2021 WL 4355334, *1 (N.D. Cal. 2021) (granting § 1782 application for service of a subpoena for evidence to be used in pending litigation in the United Kingdom). Further, Petitioner has submitted evidence that English courts are familiar with and receptive to evidence gathered through § 1782 applications. (Doc. 1-3 ¶¶ 91-95.)

The third factor is a closer call. Although the application does not appear to be an attempt to circumvent England's discovery restrictions, the Court notes that Petitioner is seeking discovery from Katerra Cayman through this Court rather than in the Cayman Islands, which is where Katerra Cayman is incorporated. (Doc. 1 at 1.) Nevertheless, there is no evidence that Petitioner's request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 264-65. For this reason, the third factor weighs in favor of granting the application or is at worst neutral.

Fourth, this request does not appear to be unduly intrusive or burdensome. The proposed subpoena requests documents from Katerra Cayman from September 2020 to May 2021 that involve the Katerra Restructuring—specifically, the Security Release Agreement, the CEA, and the Share Disposal Agreement. (Doc. 1-2.) Rather than request "any and all" documents, the subpoena seeks tailored documents at the heart of Petitioner's underlying insolvency claim with an appropriate temporal restriction. (*Id.*)

Accordingly,

**IT IS ORDERED** that the *ex parte* application under 28 U.S.C. § 1782 (Doc. 1) is **granted**.

Dated this 27th day of April, 2022.

Dominic W. Lanza
United States District Judge